# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-SA-01263-SCT

*MISSISSIPPI DIVISION OF MEDICAID AND
DREW SNYDER, IN HIS OFFICIAL CAPACITY
AS DIRECTOR OF MISSISSIPPI DIVISION OF
MEDICAID*

*v.*

*WINDSOR PLACE NURSING CENTER, INC. d/b/a
WINDSOR PLACE NURSING & REHAB CENTER,
BILLDORA SENIOR CARE, LLC, LEXINGTON
MANOR SENIOR CARE, LLC AND MAGNOLIA
SENIOR CARE, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/2018 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| TRIAL COURT ATTORNEYS: | RANDALL ELLIOTT DAY, III |
| | JANET McMURTRAY |
| | DION JEFFERY SHANLEY |
| | JULIE BOWMAN MITCHELL |
| | PHILIP JOSEPH CHAPMAN |
| | STEPHEN DEAN STAMBOULIEH |
| | CHARLES PALMER QUARTERMAN |
| | ABBIE EASON KOONCE |
| | GEORGE H. RITTER |
| | P. SCOTT PHILLIPS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA L. GIBBES |
| | JANET McMURTRAY |
| | SAMUEL PHILIP GOFF |
| | T. HUNT COLE, JR. |
| | DION JEFFERY SHANLEY |
| ATTORNEYS FOR APPELLEES: | RANDALL ELLIOTT DAY, III |
| | JULIE BOWMAN MITCHELL |
| | ELLEN PATTON ROBB |
| | PHILIP JOSEPH CHAPMAN |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     The Mississippi Division of Medicaid (DOM) appeals the Hinds County Chancery Court's judgment ordering the DOM to reverse the adjustments for "Legend Drug"[1] costs reported by Windsor Place Nursing Center, Inc., d/b/a Windsor Place Nursing & Rehab Center (Windsor) and Billdora Senior Care, Lexington Manor Senior Care, and Magnolia Senior Care (collectively Senior Care).[2]   The chancery court found that the legend drug expenses incurred by these providers were properly reported on each of their Long Term Care (LTC) cost reports as an allowable cost and should have been taken into account the by DOM in determining the *per diem* rates for each provider.

¶2.     The DOM contends that its decision to disallow the legend drug expenses claimed by the providers in their required cost report for reporting years 2005, 2007, and 2008 was supported by substantial evidence, was not arbitrary or capricious, and was within its

---

[1] Legend drugs are drugs that require a prescription from a duly-authorized practitioner.  Miss. Code Ann. 73-21-73(gg) (Supp. 2019).  This opinion uses the terms interchangeably.

[2] Referred to collectively as the "providers."  By order dated August 28, 2017, in chancery court, the appeals asserted in that court by five additional facilities (all consolidated with this case and referred to as "Vanguard") were stayed pursuant to the automatic stay provisions of the United States Bankruptcy Code.  An agreed order was entered by the chancery court lifting the stay for Windsor and Senior Care.

authority to decide. Therefore, the chancery court's order must be reversed and the DOM's decision must be reinstated. We agree with the DOM.

**FACTS AND PROCEDURAL HISTORY**

¶3. In 2008, the DOM contracted Clifton Gunderson, LLP (Gunderson), an independent audit/accounting firm to perform audit reviews of LTC annual cost reports submitted by LTC providers. Gunderson informed the DOM that certain providers were claiming legend drug costs on their cost reports for *per diem* reimbursement.

¶4. Following a "desk review process," the DOM adjusted the cost reports filed by Windsor for 2005, 2007, and 2008 and the cost reports filed by Senior Care in 2007. The DOM adjustments disallowed the prescription-drug costs that Windsor and Senior Care had claimed they incurred in providing resident care. As stipulated by the parties, the prescription-drug-adjustment-dollar amounts for Windsor and Senior Care costs were as follows:

1. Windsor 2005 ($177,446); 2007 ($249,810); 2008 ($241,997)

2. Senior Care: Billdora 2007 ($31,238);

3. Magnolia 2007 ($11,003);

4. Lexington Manor 2007 ($19,369).

¶5. Following these adjustments, the DOM sought to recoup the amounts from Windsor and Senior Care that, according to DOM, were "overcharged initially by virtue of the provider's interpretation of the cost reporting requirements." The providers filed an administrative appeal of these adjustments.

3

¶6. They claimed that the plain language of the Medicaid State Plan and the applicable cost report instructions require that all prescription drug costs "not covered by the Medicaid Drug Program (i.e., not paid for by Medicaid)" are an allowable cost. They argued that such costs were incurred by the providers as a necessary expense in caring for the residents and that their interpretation of the state plan and cost report instructions as applied to the costs reports at issue was correct and consistent with the DOM's practice.

¶7. Following multiple administrative hearings, two separate Medicaid hearing officers issued factual findings and legal conclusions that the DOM had correctly disallowed the prescription drug costs. The DOM said that the only prescription drugs that could be claimed as an allowable cost on a provider's cost report were those drugs "not covered" by Medicaid.

¶8. In summary, both hearing officers found that: (1) the prescription drugs that are "covered" by Medicaid are listed in a formulary; (2) Medicaid reimbursement for the costs of prescription drugs on the formulary is to be made directly to dispensing pharmacists under a computer point-of-sale program - not by the inclusion of any such claimed expenses on a *per diem* cost report; (3) the Medicaid State Plan provides that the amount paid for any item which is "subject to direct reimbursement" is a non-allowable cost; (4) Provider Policy Manual (PPM) section 36.07 (2/04) provides that services that could be billed directly to Medicaid, which include lab services, x-rays, and drugs covered by the Medicaid drug program, are non-allowable costs; (5) PPM section 31.07 (2/04) defines the drug costs that could be allowed on an LTC *per diem* cost report as mostly over-the-counter drugs; (6) the LTC Cost Report Instructions (3/05) in effect at all relevant times for the 2005, 2007, and

4

2008 reporting years advised that only the cost of drugs "not covered by the Medicaid Drug Program" could properly be claimed; (7) the amended cost report instructions that became effective in May 2009 were not a substantive change to previous instructions or policy and were not applied retroactively by the DOM to the subject cost reports and actually were not applied at all; and (8) the DOM is permitted to correct errors in LTC cost reports and to make appropriate adjustments for overcharges and doing so is not a change in rate methodology.

¶9. The executive director of the DOM adopted the findings, report, and recommendations of the hearing officers. The providers appealed the DOM's decision to the chancery court, and the appeals were consolidated into one.

¶10. The providers claimed in the chancery court that the evidence and testimony presented at the administrative hearings showed that the DOM had never disallowed prescription drug costs incurred by a provider from the provider's cost report until Gunderson's audit review in 2008. They claimed that numerous witnesses testified at the hearings that it was not until Gunderson's audit that the DOM made a decision to change its practice and policy for allowing prescription-drug costs.

¶11. The providers acknowledged that the DOM properly amended the cost report instructions, effective May 12, 2009, and the state plan, effective March 18, 2010. But they contended that the DOM's adjustments to the cost reports before the effective dates of these amendments violated the law because the DOM retroactively applied new rules.

¶12. The chancery court agreed with the providers. According to the chancery court, no substantial evidence was presented by the DOM to support a finding that the legend drug

5

costs at issue were not an allowable cost before 2008. The DOM had argued and the hearing officers had found that it was simply an error that the providers' cost reports had never been adjusted to disallow legend drug costs and that the error was caught by the DOM in 2008, before the amendments.

¶13. But, according to the chancery court, the DOM failed to present substantial evidence to support this determination. The chancery court found that the change in policy in 2008 was a substantial change that resulted in decreasing the *per diem* reimbursement rate to the providers. The court said that "[t]his change resulted in an about-face by DOM and made Legend Drug costs which were once allowable by the Medicaid program no longer allowable." Accordingly, the chancery court found that the DOM arbitrarily changed its policy without properly amending the state plan and cost-report instructions.

## DISCUSSION

¶14. This Court employs the same standard of review that our lower courts are bound to follow when reviewing agency decisions. *Crossgates River Oaks Hosp. v. Miss. Div. of Medicaid*, 240 So. 3d 385, 387 (Miss. 2018) (citing *Miss. Comm'n on Envtl. Quality v. Chickasaw Cty. Bd. of Supervisors*, 621 So. 2d 1211, 1216 (Miss. 1993)). "Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law." *Miss. State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss.1993) (quoting *State Farm Ins. Co. v. Gay*, 526 So. 2d 534, 535 (Miss. 1988)). An administrative decision may be reversed if the decision "(1) was not supported by substantial evidence, (2) is

6

arbitrary or capricious, (3) was beyond DOM's power to adopt, or (4) violates a constitutional or statutory provision." *Id.* (citing *Town of Enterprise v. Miss. Pub. Serv. Comm'n*, 782 So. 2d 733, 735 (Miss. 2001)).

¶15.     Interpretation of a rule or regulation governing the agency concerns a matter of law, which is reviewed de novo, with great deference afforded to the agency's interpretation of the rule. *Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 678 (Miss. 2006) (quoting *McDerment v. Miss. Real Estate Comm'n*, 748 So. 2d 114, 118 (Miss. 1999)). This deference, however, does not extend to an agency's interpretation of a statute, "which is properly reserved to the courts of this state." *King v. Miss. Military Dep't*, 245 So. 3d 404, 408 (Miss. 2018).

¶16.     Medicaid is a cooperative federal-state program that provides medical assistance to medicaid-eligible individuals. *Jones v. Howell*, 827 So. 2d 691, 693 (Miss. 2002). To qualify for federal funds, a state must submit a Medicaid plan to the secretary of the Department of Health and Human Services for approval. *Cent. Miss. Med. Ctr. v. Miss. Div. of Medicaid*, No. 2018-SA-01410-SCT, 2020 WL 728806, *1 (Miss. Feb. 13, 2020) (citing 42 U.S.C. § 1396 (2012)), *reh'g denied* (Miss. May 7, 2020). The DOM "is bound to follow the plan and cannot deviate from it." *Id.* (citing *Crossgates River Oaks Hosp.*, 240 So. 3d 385).

¶17.     Attachment 4.19-D of the state plan, "Guidelines for the Reimbursement for Medical Assistance Recipients of Long Term Care Facilities," in effect for the cost-reporting periods at issue, reads in part as follows:

Each long-term care facility which has contractually agreed to participate in the Title XIX Medical Assistance Program will adopt the procedures set forth in this manual; each must file the required cost reports and will be paid for the services rendered on a rate related to the allowable and reasonable costs incurred for care and services provided to Medicaid recipients. Payments for services will be on a prospective basis.

. . . .

While it is recognized that some providers will incur costs in excess of the reimbursement rate, the objective of this plan is to reimburse providers at a rate that is reasonable and adequate to meet the costs that must be incurred by efficiently operated nursing facilities that comply with all requirements of participation in the Medicaid program.

¶18.    Attachment 4.19-D also contains the following provision:

Non-Allowable Costs.

Certain expenses are considered non-allowable for Medicaid purposes because they are not normally incurred in providing patient care.  These non-allowable costs include, but are not limited to, the following types of expenses.

. . . .

(9) Other Non-Allowable Costs.

The cost of any services provided for which residents are charged a fee is a non-allowable cost.  In addition, the amount paid for any item subject to direct reimbursement by the Division of Medicaid is a non-allowable cost.

¶19.    The DOM's Medicaid PPM section 36.07, "Nursing Facility, Per Diem Covered Services," provides in pertinent part

Services and Items Covered by the Medicaid Per Diem Rate

Any services or supplies that may be billed directly to Medicaid for nursing facility residents are non-allowable costs on the cost report and must be billed directly.  These providers must have a separate provider number from that of the nursing facility.

8

These include:

Laboratory services
X-ray services
Drugs covered by the Medicaid drug program

¶20. Medicaid PPM section 31.17, "Pharmacy, Subject: Long Term Care Facilities" also provides that

Long-term care (LTC) residents may receive prescription, if the medication orders, signed by the prescribing provider, are documented in the individual patient record at the LTC. The pharmacist must maintain all transcribed documentation in his/her own prescription files.

. . . .

The cost of any drug supplied to residents in opposition to Medicaid policy and/or prior authorization requirements are not allowable on the facilities' cost reports.

¶21. Based on a plain reading of the state plan and the Medicaid PPM, in effect at the times at issue, LTC providers are not entitled to Medicaid reimbursement for the costs of a legend drug subject to direct reimbursement by the Division of Medicaid. The language contained in attachment 4.19 D of the state plan is clear: "the amount paid for any item subject to direct reimbursement by the Division of Medicaid is a non-allowable cost." Pursuant to Medicaid policy, drugs covered by the Medicaid drug program must be billed directly to Medicaid and are non-allowable costs on a provider's cost report. *See* Medicaid PPM section 36.07.

¶22. This is in compliance with the controlling statutes. "It is the intent of the Legislature that the pharmacists providers be reimbursed for the reasonable costs of filling and dispensing prescriptions for Medicaid beneficiaries." Miss. Code Ann. § 43-13-117(9) (Supp. 2019). The DOM is required to establish reasonable fees, charges, and rates for

9

drugs. Miss. Code Ann. § 43-13-121 (Rev. 2015). The DOM "shall fix . . . those rates at the minimum levels absolutely necessary to provide the medical assistance authorized by this article, and shall not change any of those fees, charges or rates except as may be authorized by [Mississippi Code] Section 43-13-117." Miss. Code Ann. § 43-13-121.

¶23.    In *Jones*, this Court provided a brief overview of Medicaid's drug reimbursement program for pharmacists:

> To become a Medicaid provider, a pharmacist must submit an application and execute a Medical Assistance Participation Agreement . . . with the Division of Medicaid. Pursuant to the participation agreement, the pharmacist fills prescriptions for Medicaid recipients and submits claims for reimbursement to the Division of Medicaid. The Division of Medicaid reimburses each provider at the end of each month according to a specific formula.

*Jones*, 827 So. 2d at 694 (construing Miss. Code Ann. § 43-13-117(9) (Supp. 2011)).

¶24.    No where in the controlling statutes, the state plan, or Medicaid's policy do we see language that lends itself to a construction taken by the providers that all prescription drug costs "not covered" by the Medicaid drug program means drug costs "not paid for" by Medicaid. Were such an interpretation accepted, all of the aforementioned provisions above and the intent behind them would be rendered nugatory.

¶25.    While the DOM may have failed to catch this in the past, legend drugs covered by Medicaid's Drug Program are subject to direct reimbursement from Medicaid to the dispensing pharmacist, and constitute a non-allowable cost for the provider's *pier diem* reimbursement report. And any action taken to the contrary by Medicaid is a violation of its rules and regulations.

10

¶26. Accordingly, we find that the chancery court erred reversing the DOM's decision.

**CONCLUSION**

¶27. We find that the DOM's decision to disallow the legend drug costs claimed by the providers in their *per diem* cost reports for the reporting years 2005, 2007, and 2008 was supported by substantial evidence, was not arbitrary and capricious, and was within the DOM's authority. We reverse the chancery court's order and reinstate the DOM's decision.

¶28. **REVERSED AND RENDERED.**

**RANDOLPH, C.J., MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. COLEMAN, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.; GRIFFIS, J., JOINS IN PART. KING, P.J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**COLEMAN, JUSTICE, SPECIALLY CONCURRING:**

¶29. I concur with the majority's analysis in the case *sub judice* with the exception that I am of the opinion that the practice of extending judicial deference to an executive agency's interpretation of its own rules and regulations should end. However, even under a *de novo* standard of review, I agree with the result reached by the majority. The plain language of the Medicaid State Plan and the Department of Medicaid Provider Policy Manual provides that drugs that are subject to direct reimbursement from Medicaid to the dispensing pharmacist constitute a non-allowable cost for the provider's *per diem* reimbursement report.

I. **The Court should no longer defer to executive agency interpretations of rules or regulations.**

11

¶30. The standard of review proposed by the majority for interpretation of agency-promulgated rules and regulations is as follows:

> This Court employs the same standard of review that our lower courts are bound to follow when reviewing agency decisions. ***Crossgates River Oaks Hosp. v. Miss. Div. of Medicaid***, 240 So. 3d 385, 387 (Miss. 2018) (citing ***Miss. Comm'n on Envtl. Quality v. Chickasaw Cty. Bd. of Supervisors***, 621 So. 2d 1211, 1216 (Miss. 1993)). . . .

> Interpretation of a rule or regulation governing the agency concerns a matter of law, which is reviewed de novo, with great deference afforded to the agency's interpretation of the rule. ***Sierra Club v. Miss. Envtl. Quality Permit Bd.***, 943 So.2d 673, 678 (Miss. 2006) (quoting ***McDerment v. Miss. Real Estate Comm'n***, 748 So. 2d 114, 118 (¶ 9) (Miss. 1999)).

Maj. Op. ¶¶ 14, 15.

¶31. The *de-novo*-but-with-deference standard is confusing and has been applied inconsistently in recent years. In fact, the majority cites two cases in the standard-of-review section in the case *sub judice* which are inherently contradictory. The Court in ***Crossgates***, citing ***Sierra Club***, stated that "[a]n agency's interpretation of a rule governing the agency's operation is a matter of law that is reviewed de novo, but with great deference to the agency's interpretation." ***Crossgates River Oaks Hosp. v. Miss. Div. of Medicaid***, 240 So. 3d 385, 387 (¶ 7) (Miss. 2018) (citing ***Sierra Club v. Miss. Envtl. Quality Permit Bd.***, 943 So. 2d 673, 679 (¶ 17) (Miss. 2006)). In the very next sentence, the Court in ***Crossgates*** stated, "[h]owever, an agency's interpretation will not be upheld if it is 'so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.'" ***Id.*** (quoting ***Div. of Medicaid v. Miss. Indep. Pharmacies Ass'n***, 20 So. 3d 1236, 1238 (¶ 6) (Miss. 2009)). That

sentence in *Crossgates* contradicted what was said in *Sierra Club*: "However, where an administrative agency's interpretation is contrary to the unambiguous terms or best reading of a statutory provision, the agency is not entitled to deference." *Sierra Club*, 943 So. 2d at 679 (¶ 17) (citing *Miss. Gaming Comm'n v. Imperial Palace of Miss., Inc.*, 751 So. 2d 1025, 1029 (¶ 16) (Miss. 1999)).

¶32. The language in *Crossgates* only obviates agency deference if the agency's interpretation is "plainly erroneous" or "an abuse of discretion," *Crossgates*, 240 So. 3d 387 (quoting *Div. of Medicaid v. Mississippi Indep. Pharmacies Ass'n*, 20 So. 3d 1236, 1238 (¶ 6) (Miss. 2009)), while the language in *Sierra Club* obviates agency deference if their interpretation is repugnant to the "best reading of [the] statutory provision,." *Sierra Club*, 943 So. 2d at 679 (¶ 17) (quoting *Imperial Palace of Miss., Inc.*, 751 So. 2d 1025, 1029 (¶ 16) (Miss. 1999)). The *Sierra Club* standard of review gives far less deference than the standard in *Crossgates*, and both cases were cited in the case *sub judice*. Having contradictory standards of review creates inconsistency in results.

¶33. Further, the unanimous Court in *King* ended the practice of giving deference to state agencies' interpretations of statutes. *King v. Miss. Military Dep't*, 245 So. 3d 404, 408 (¶ 10) (Miss. 2018). The *King* Court held that granting deference to an agency's interpretation of statutes ran afoul of the Mississippi Constitution. *Id.* Similarly, granting deference to an agency's interpretation of rules and regulations runs afoul of the Mississippi Constitution:

> No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself,

13

and at once, vacate any and all offices held by the person so accepting in either of the other departments.

Miss. Const. art. 1, § 2.

¶34. Granting deference to an agency's interpretation of rules and regulations puts all or part of the three functions of government into one branch, something the Mississippi Constitution explicitly prohibits. When it comes to pure questions of law, the Court should review agency interpretations of rules and regulations *de novo*.

**KING, P.J., JOINS THIS OPINION. GRIFFIS, J., JOINS THIS OPINION IN PART.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶35. I disagree with the majority for two reasons.

¶36. First, I disagree with the majority's characterization that the "DOM may have failed to catch this in the past . . . ." Maj. Op. ¶ 25. This implies that the providers here were without any reason or justification to include legend drug costs in its *per diem* reimbursement-cost reports. In fact, the DOM presented no evidence that it had ever taken the position that legend drugs were not an allowable cost.

¶37. This is supported by the DOM's own employees. Brian Smith, the DOM's accounting auditing bureau director, was offered as an expert witness in interpretation and application of the Medicaid State Plan and cost reporting and reimbursement for long-term-care (LTC) facilities for drugs. Smith had been employed in the auditing department since 1994 and testified he had no knowledge that legend drug costs had ever been adjusted to non-allowable before 2008. Smith estimated that he had participated in over two hundred audits. Smith

testified that he first became aware of an issue related to the cost of legend drugs during the 2008 Clifton Gunderson audits.

¶38. Eric Everett was an accountant auditor professional 3 in the DOM Reimbursement Bureau. He was responsible for conducting desk reviews of cost reports for all nursing homes and was tendered as an expert regarding cost reports, desk reviews, and interpretation and application of the state plan and Medicaid policy as it relates to LTC facilities. Everett testified that a group within the DOM first began discussing legend drug costs sometime in 2008. Before that, he had never been instructed to nor had he made an adjustment to disallow legend drug costs.

¶39. T. J. Walker was employed by the DOM Bureau of Reimbursement as an accountant auditor professional 3. He conducted the secondary review of the initial desk review by Everett of all cost reports. Walker had been employed with Medicaid since 2001 and worked within the Bureau of Reimbursements since 2002. Walker was offered as an expert in the interpretation and application of the state plan, cost reporting, and reimbursement of LTC facilities for drugs. Walker testified that his department first began to review drug costs after Clifton Gunderson conducted audits in 2008. Before that, the Bureau of Reimbursement had never questioned that costs for over-the-counter and legend drugs were allowable.

¶40. Based on the testimony of the DOM's own employees, there was simply no evidence that would support the majority's claim that the "DOM may have failed to catch this in the past . . . ." Maj. Op. ¶ 25.

15

¶41.   Further, on May 7, 2008, the DOM Bureau of Reimbursement sent an email "Notice to Nursing Facility Cost Report Preparers."  This notice included the following:

> DIRECT CARE COSTS FOR DRUGS: OVER-THE-COUNTER AND LEGEND
> The Division has become aware of a major reporting problem related to Form 6, Line 1-14 for over-the-counter and legend drugs reported as allowable costs. These costs should be minimal for all providers. The reported costs by nursing facilities for this line item are just short of $8,000,000 in 2006. Reported costs range from $0.00 to $321,633 and reach up to 14% of total direct care costs. It is imperative that facilities reclassify all non-allowable drug costs to Form 6, Line 6-13 of the cost report. Facilities must classify expenses for all residents the same, regardless of their pay source.

¶42.   The majority's characterization of this is contrary the DOM's memorandum of May 7, 2008, sent to cost-report preparers.  This memorandum clearly established that the DOM's past practice included legend drug costs.  In this memorandum, the reported costs for all nursing facilities was "just short of $8 million in 2006" and "reach up to 14% of total direct care costs."  The chancellor properly considered this memorandum as evidence that many, if not all, providers interpreted the DOM's instructions and state plan just as the providers did in this case.  Certainly, contrary to the majority's characterization, it may not be said that the "DOM may have failed to catch this in the past . . . ."  Maj. Op. ¶ 25.  As the DOM argued and the hearing officers concluded, these providers did not just slip through the cracks due to an error.

¶43.   Second, I disagree with the majority's reading of the state plan and the DOM's instructions.  The majority would have us believe that there was no reason or justification for the providers to include legend drug costs in its *per diem* reimbursement-cost reports.

16

¶44. The state plan provides that "the amount paid for any item subject to direct reimbursement by the Division of Medicaid is a non-allowable cost." In fact, pursuant to Medicaid policy, drugs covered by the Medicaid drug program must be billed directly to Medicaid and are non-allowable costs on a provider's cost report. *See* Medicaid PPM section 36.07. I agree.

      *1.    The State Plan*

¶45. The State Plan identifies two categories of drugs—Legend and over-the-counter (OTC). In fact, the "Allowable Costs" section of the state plan has two provisions that apply to drugs. "In order for a cost to be an allowable cost for Medicaid reimbursement purposes, it must be reasonable and necessary in the normal conduct of operations related to providing patient care . . . :"

> 14.    Personal Hygiene Items. The cost of routine personal hygiene items and services as required to meet the needs of the residents, including, but not limited to, . . . *over-the-counter drugs that are not covered by the Mississippi Medicaid drug program* . . . .

> 17.    Supplies and Materials. This includes, but it not limited to, medical supplies, *legend drugs that are not covered by the Mississippi Medicaid drug program*, . . . Medical supplies necessary for the provision of care in order to attain or maintain the highest practical physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care are allowable costs. Any supplies or equipment ordered by a resident's attending physician must be provided by the facility and will be an allowable cost as a supply expense . . . .

(Emphasis added.)

¶46. According to the state plan, as written from 1994 to 2010, "*legend drugs that are not covered by the Mississippi Medicaid drug program*" were considered "medical supplies."

17

In fact, if legend drugs were ordered by the resident's physician, the provider was required by law to pay for and to provide legend drugs for its residents. Thus, the providers were instructed that the cost for OTC and legend drugs "will be allowable costs" on the provider's cost report as long as they are "not covered by the Mississippi Medicaid drug program."

>    2.    *Cost Report Instructions*

¶47.    The DOM's Cost Report Instructions provide guidance as to the allowable costs for the years at issue:

> Line 1 Direct Care Expenses
>
> Cost of direct care of medical services must be included in Section 1 lines 1-01 through 1-18. Lines 1-05 to 1-10 are for employee benefits for the direct care employees.
>
> Line 1-14, Drugs Over-the-Counter and Legend
>
> Cost of over-the-counter and Legend Drugs provided by the facility to its residents. This is for drugs not covered by the Medicaid Drug Program.

The cost report instructions are consistent with and follow the language of the state plan quoted above.

>    3.    *Cost Report and Medicaid-Reimbursement Program*

¶48.    It is important to note that nursing facilities are not directly reimbursed by Medicaid for costs they incur in care of residents enrolled in Medicaid. Instead, each facility is "reimbursed" for reasonable costs incurred in caring for residents through a prospective method of payment, by which a *per diem* rate is established for each resident.[3] The *per diem*

---

[3] The *per diem* rate established by the DOM based on costs allowed from a 2005 report would be the rate paid to the provider during 2007.

rate is calculated, in part, based upon allowable costs disclosed on a provider's cost report. The DOM adjustments that disallowed legend drug costs actually incurred in providing resident care resulted in a substantial reduction to the *per diem* rate for each of these providers.

¶49.    The providers involved here, just like all privately operated nursing facilities, must submit cost reports following the close of each calendar reporting year of January 1 through December 31.  Cost reports must be prepared in accordance with the state plan for reimbursement of long-term-care facilities.  Providers are obligated to report all expenses correctly when signing the cost report.

### 4.    *Pharmacy Program*

¶50.    There is a Pharmacy Program in Medicaid.  LTC providers are not authorized to directly bill Medicaid for legend drugs ordered by a physician for LTC residents.  To bill Medicaid directly for drug costs, the provider must be a pharmacy with a Medicaid pharmacy-provider number (agreement).  Typically, the physician prescribes the drug and the prescription is submitted to a pharmacist who fills the prescription and bills Medicaid or any other payor source for the drug. This process is referred to by the DOM as the point-of-sale (POS) program. Under the POS program, the providers relied upon the pharmacists to follow this procedure.

¶51.    But the LTC providers are not involved in the POS program.  As the providers and their experts testified, if the pharmacy did not get reimbursed for the cost of the drug, it billed

the provider, and the provider is required by the state plan to pay for the drugs. This is why these providers incurred the cost of the drugs in dispute.

### 5. The providers followed the state plan and instructions

¶52. The chancellor held that the plain language of the state plan and the applicable instructions required that all legend drug costs "not covered by the Medicaid Drug Program," i.e., not paid for by Medicaid, are an allowable cost. Such costs were incurred by the providers as a necessary expense in caring for the residents. The provider's interpretation of the state plan and instructions were not only reasonable but were consistent with the DOM's practice before 2008.

¶53. The evidence presented supports the chancellor's decision.

¶54. A number of experts testified about the Medicaid cost reports and the meaning of certain terms. They testified that the term "not covered" means "not paid for." They explained that because Medicaid did not pay for the drugs, the provider was required to do so. They concluded that, under the state plan, such costs paid by the provider were allowable on the cost report.

¶55. Certified Public Accountant David Stewart was offered as an expert witness in the preparation of cost reports. He testified that he prepared cost reports for approximately twenty skilled nursing facilities and that he had been preparing cost reports for approximately fifteen years. Stewart testified that he always included legend drugs and OTC drug costs not paid for by the DOM as an allowable cost on his clients' cost reports. Stewart explained that he interpreted the state plan and instructions to mean that if a drug was "covered" by the

20

DOM, it was paid for. He also testified that the DOM had never reclassified legend or OTC drugs on any of his clients' cost reports before 2008. Stewart also presented a summary that indicated that senior-care facilities' legend drug costs had not been questioned dating as far back as 2001.

¶56. As discussed above, the DOM employees who testified did not contradict Stewart or any of the other financial experts offered by the providers. In fact, the DOM admitted that the DOM had never reclassified legend drug costs to non-allowable before the Clifton Gunderson audit or the desk reviews that occurred after 2008.

¶57. The majority finds no significance that the DOM determined it was necessary to amend the state plan and the instructions. The DOM followed the Administrative Procedures Act, Mississippi Code Section 25-43-1.101 (Rev. 2018), and the amendments to the state plan and the instructions became effective on May 12, 2009. The DOM also amended the state plan effective March 18, 2010. These amendments changed the way legend drug costs paid by all providers were treated and those costs are no longer allowable.

¶58. Frankly, this case demonstrates the error of this Court's granting an administrative agency deference in its interpretations. Before the Gunderson audit, the DOM's own employees did not question the providers' inclusion of legend drugs in the cost reports. The DOM asks this Court to give it deference after it concluded that it believed the legend drugs should not be included in the cost reports. The DOM apparently, at some point, changed its interpretation of its own state plan and instructions. The DOM's interpretation is entitled to no deference by this Court.

21

¶59.  I am of the opinion that the chancellor's judgment should be affirmed.  The chancellor properly held that there was a lack of evidence to support the decision that legend drug costs had never been accepted by the DOM as an allowable cost.

¶60.  For these reasons, I respectfully dissent.

**KITCHENS, P.J., JOINS THIS OPINION.**